Curia, per

Richardson, J.
If the condition upon which King & Co. promised to accept the draft of Dr. Holland, was practically fulfilled, it is not to be questioned that King & Co. are as liable as if they had accepted the draft. Mason vs. Hunt, (1 Doug. 297.) It is equally clear that, if Dr. Holland, in the course of the negociations and arrangements made for meeting the payment of his draft, placed money in the hands of King & Co. for that purpose, then too, King & Co. may be made liable for the money so received for Hickman. These legal propositions are undeniable; and, the jury having found that King & Co. did receive the proceeds of the Doctor’s crop for the payment of his debt to Hickman, the questions for the Court to decide arise out of the state of facts, from which the jury drew the inference that King & Co. had received such proceeds for that purpose. We have, *135 then, to enquire, 1st. whether the condition was fulfilled, entire, so as to compel King & Co. to pay the draft; or, 2nd, was it fulfilled in part, so as to render them liable for money received for the use of Hickman.
The facts are almost as plain as the law of the case. In answer to Mr. Hickman’s letter of the 29th December, 1836, King & Co., by their letter of the 4th January, 1837, contracted with Hickman to accept the draft of Dr. Holland for $10,000, provided the Doctor should send them 66,000 lbs. of seed cotton — equal to about 60 bales of ginned cotton — and also 120 barrels of sugar. Accordingly, on the 20th February, Dr. Holland drew in favor of Hickman, for $7,600. This draft was returned to Hickman, on the 17th March, duly protested, because the cotton and sugar had not been transmitted to King & Co., or placed within their control, according to their contract of the 4th of January. At this period, no one can suppose that King & Co. were in any way bound to pay the draft
Afterwards, however, some cotton and sugar were sent, which would seem to be a partial fulfilment of the condition required by King & Co. But it should be borne in mind, that Hickman, only acting apparently as the agent of Dr. Holland, made the representation of his crop to King & Co., and promised the consignment to them for a certain purpose; whereas, the cotton and sugar were shipped by Dr. Holland himself, without notice of the supposed purpose, and he received the usual advances in such cases; which left a balance of only $1,637 out of the sales of $4,236 98. Holland also demanded this balance, and finally assigned it to a person in Savannah, after King & Co. had refused to accept his draft to G. Anderson & Son. Here we have a total failure, if not an absolute contradiction, of the consignment to meet the bill, as promised by Hickman. It would seem, from such evidence of his intentions, that Dr. Holland never placed his cotton and sugar at the discretion of King & Co., or con *136 sidered his crop as pledged in their hands to pay the draft to Hickman. On the contrary, he appears, by his whole conduct, to have repudiated the arrangement, which had been made in his name by Hickman, to meet the draft of $7,600. This course, we may presume, was adopted upon the protest of the draft on the 17th March by King & Co. For,although King & Co. afterwards received 30 bales of cotton and 79 barrels of sugar of Dr. Holland, yet these, if we may judge from the use made of the proceeds by Dr. Holland, were placed in their hands for other purposes than to pay the protested draft. What could King & Co. do ?, They had no discretionary power over the cotton and sugar of Dr. Holland. Unless authorized by him, they could not pay over the amount of sales to the protested draft, or to Hickman : because Hickman himself, (not Holland,) had engaged that Holland’s crop should be consigned to them to meet the draft.
It is very rational to presume that Dr. Holland had promised Hickman to fulfil the engagement made in his name, in order to induce King & Co. to honor his draft: But it is clear, from the evidence, that he did not consign any cotton and sugar for such purposes. For some cause, Dr. Holland did not recognize or fulfil the terms and conditions held out by Hickman in his letter of 29th December, 1837, upon which King & Co, promised to accept the draft to Hickman,
It is vain to urge that this was the fault of Holland, not of Hickman. That may or may not be. It is enough that the condition upon which King & Co. engaged to accept the draft of Dr. Flolland in favor of Hickman did fail. King &> Co. did not make the contract with Dr. Holland. They relied upon Hickman, and his warranty was, that Holland would ship the cotton and sugar, for the purpose which he (Hickman) promised, to King & Co. The failure, then, has been entirely in the condition promised on the part of Hickman. And King & Co. continued, throughout the whole transaction, in the same situation in which they were at the *137 time they first protested the draft of $7,600. It does not appear that they ever had any of Holland’s money that they could legally credit to Hickman. Such an idea can only arise from assuming that Holland shipped his cotton and sugar to King & Co. in order to fulfil the promise of Hickman that Holland would do so for a certain purpose. But it is evident, whatever may have, been the understanding between them, that Holland kept his cotton and sugar under his own control and used the proceeds for other purposes.
Where then is the evidence that King & Co. ever had authority to apply the proceeds of Holland’s cotton and sugar to the credit of Hickman! We have, it is true, the assurance of Hickman that the cotton and sugar would be consigned for that purpose by Holland. But Holland himself, appears to have discarded every idea of the kind, although he employed King & Co. as his factors. Who then must suffer! Not King & Co., but'Hickman, who failed to induce Holland to consign his cotton and sugar for the purpose of meeting his draft. We are unable, therefore, to perceive, in the evidence before us, that the conditional promise made by King & Co. to accept the draft, was at any time binding upon them; because the condition was never fulfilled, either to the amount of the draft, or, to the extent of the proceeds of Holland’s cotton and sugar. Such proceeds, it is true, passed through their hands as Holland’s factors. But they were never placed, by Holland, in the hands' of King & Co. to meet the engagement promised by Hickman in the name of Holland. Between the promise of Hickman, of what the Doctor would do, and the non-performance by the Doctor himself, the condition was never fulfilled, and King & Co. were kept in suspense and powerless from the beginning to the end of the transaction.
It may be difficult to account for such non-conformity between the Doctor’s action and Hickman’s word. But assuredly, it does not fall on King & Co. to reconcile their misunderstanding. King & Co. had nothing to do but to receive *138 the cotton and sugar of Holland, either as his factors, or upon such terms as he, not Hickman, might direct. Whereas, the plaintiff’s action is bottomed upon the assumption that, if Holland sent his crop to King & Co. at all, the proceeds must go to pay his debt to Hickman, upon Hickman’s word, with or without the direction oí Holland. That is to say, the promise of the imputed agent, Hickman, is to control the conduct and direction of the actual principal, Holland. And that is to be done, too, to support his action against a new set of debtors, King & Co., in place of Dr. Holland. If Holland had simply consigned his sugar and cotton to King & Co., there would have been reason, under attending circumstances, to imply his assent that the proceeds should go to pay his debt to Hickman ; and in this way, a privity between Hickman and the defendants, as to such proceeds, might have been constituted to support the verdict for money received for Hickman. But it belongs to the owner and consignor to direct the appropriation of his consignment, and we cannot imply his assent to a particular appropriation, when he has himself plainly dissented by making a different appropriation. Assuredly, King & Co. could not, upon the promise of Hickman, have resisted a suit brought by Holland for the balance of his crop in their hands : And if so, Hickman cannot recover the same money.
The reasoning and doctrine of the decision in Williams vs. Everett, (14 East. 581,) and the cases referred to, are authoritative, if not conclusive of this case. Such precedents are constituent parts of sound judicial decisions at common law, and belong to the full hearing which common law awards to all parts. It was doubtless upon this last consideration that the Circuit Judge refused a non-suit in the case before us, That is the usual course of our courts in cases of complexity, through caution; because, when the Judge .and jury concur, after a full hearing, the decision often satisfies the losing party. Upon the subject of judicial decision, *139 1 would observe, that we would have the trial by jury, in the language of our constitution, “ as heretofore used in this State, forever inviolably preserved.” It affords, perhaps, the most important practical check upon power, found in the State constitution. But the qualifying terms “ as heretofore used in this State,” have their place. And wherever a verdict of indebtedness has been rendered for a plaintiff, whose case is incompetent in itself to constitute the essential premises of such a verdict, there is a counter and conservative check, “ as heretofore used in this State,” which must also be inviolably preserved. Otherwise, the very veneration, now so justly felt for jury.trials, would become a mere name to impose upon the weak and Unreflecting. And the court being unanimous-* ly of opinion, in the case before us, that there is nothing in the evidence to warrant a verdict for the representatives of Mr. Hickman against King & Co., whatever may be th® merits of their claims upon Holland, the non-suit moved for on the circuit is granted.
Peronneau, Mazyck Finley for the motion.-
Gantt, Earle and Butler, JJ. concurred.